

*hmg 5.7.25*
ADE/MP:  USAO#2025R00239

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** ABA-25-143 |
| | * | |
| **PATRICK TORMAY BRITTON-** | * | **(Wire Fraud, 18 U.S.C. § 1343;** |
| **HARR,** | * | **Forfeiture 18 U.S.C. § 981(a)(1)(C);** |
| | * | **21 U.S.C. § 853(p); 28 U.S.C.** |
| **Defendant.** | * | **§ 2461(c))** |
| | * | |

## INDICTMENT

## COUNTS ONE THROUGH SIX
### Wire Fraud

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times material to the Indictment:

1.     Defendant **PATRICK TORMAY BRITTON-HARR ("BRITTON-HARR")** lived in Maryland and Florida.  **BRITTON-HARR** owned AeroVanti, Inc., and its affiliated entities including, but not limited to, AeroVanti Aircraft, LLC., AeroVanti Aviation, LLC, AeroVanti Yacht Club, LLC., and AeroVanti Brokerage, LLC. (collectively "**AeroVanti**").  From at least 2021 through approximately April 2023, **BRITTON-HARR** was **AeroVanti's** Chief Executive Officer.

2.     **AeroVanti** was a private membership-based club that offered on-demand flights for the benefit of its members aboard aircraft that **AeroVanti** owned or leased.  **AeroVanti's** principal place of business was in Annapolis, Maryland, and its flight operations were based out of Sarasota, Florida.

3.      **BRITTON-HARR** controlled other entities including, but not limited to, holding companies, which **BRITTON-HARR** used to, among other things, own assets, such as boats, and lease real estate.

### The TOP GUN LLCs

4.      From approximately November 2021 through January 2022, **BRITTON-HARR**, acting on behalf of **AeroVanti**, entered into lease-purchase agreements for five Piaggio-manufactured aircraft bearing Federal Aviation Administration ("FAA") tail numbers N2444Z, N290BC, N111VR, N189LW, and N1037W.

5.      Beginning in approximately March 2022, **BRITTON-HARR** created a class of **AeroVanti** customers known as "Top Gun" members.  This new group of "Top Gun" members agreed to pay approximately $150,000 in exchange for certain benefits, including 100 pre-paid flight hours.

6.      Top Gun members were organized into five limited liability companies ("LLCs") of approximately twenty individual members, or "unitholders," per LLC.  Each LLC was created to finance AeroVanti's debt-free purchase of one of the five aircraft identified in Paragraph 4 of this Indictment on **AeroVanti's** behalf.  Each LLC was named according to the FAA tail number of the aircraft it was created to purchase.  The LLCs were each registered in Maryland between approximately March 2022 and August 2022 and were named as follows: 44Z, LLC; 90BC, LLC; N189LW, LLC; N111VR, LLC; and N1037W, LLC.  The registered agent for each LLC was a Top Gun unitholder known hereafter as Individual-1.

### The Member Agreements

7.      Each unitholder executed a "Membership Agreement and Flight Services Agreement" with **AeroVanti.** Each LLC, or "Member," along with the individual unitholders, also executed an "Addendum

to Aerovanti Member Agreement for Purchase of Block Time Flight Hours." Together, these agreements were called "the Member Agreement."

8.      Each unitholder's payment was held in escrow on behalf of the LLC by an agent located in Oklahoma. This money could be disbursed to **AeroVanti** only for the reasons set forth in Paragraph 1.d of the Member Agreement. The primary justification for disbursal of unitholder funds under Paragraph 1.d was to "acquire and recondition a [specifically designated aircraft] to meet AeroVanti fleet standards and conformity with Part 135 requirements[.]"

9.      The Member Agreement provided the unitholders security for their pre-paid flight hours by requiring **AeroVanti** to "endorse in blank and deliver to the escrow agent the title to the [specifically designated aircraft]. The purpose of this procedure is to ensure that AeroVanti maintains insurance and other obligations affecting the airplane and maintains the aircraft in accordance with Part 135 of the Federal Aviation Administration regulations." **AeroVanti** further agreed that should it "fail to insure and maintain the [specifically designated aircraft as required by Part 135, or otherwise materially defaults on its obligations, then Member may declare default[.]" **AeroVanti** further agreed that if it failed to cure the default, "then Member may require the escrow agent to deliver to member the aircraft title documentation as set forth in the escrow agreement."

10.      **BRITTON-HARR** executed each Member Agreement on behalf of **AeroVanti**. Individual-1 executed each Member Agreement on behalf of the LLCs.

11.      According to the Member Agreement, Individual-1 was required to approve each disbursal from the escrow account to **AeroVanti**. Individual-1 and **BRITTON-HARR** digitally signed disbursal instructions they received from the escrow agent. Each instruction listed the amount of money authorized for disbursal, the amount of remaining LLC funds held in escrow, and that the disbursal was done in

accordance with Paragraph 1.d of the Member Agreement.  At times, **BRITTON-HARR** and Individual-1 digitally signed these disbursal instructions within the District of Maryland.

### Scheme and Artifice To Defraud

12.     From at least November 2021 through at least October 2023, in District of Maryland, and elsewhere, the defendant,

### PATRICK TORMAY BRITTON-HARR,

knowingly devised and intended to devise a scheme and artifice to defraud Top Gun unitholders, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and transmitted and caused to be transmitted by means of wire communications in interstate commerce, writings, signals, pictures and sounds for purpose of executing such scheme and artifice to defraud.

### Purposes of the Scheme

13.     A purpose of the scheme to defraud was for **BRITTON-HARR** to fraudulently obtain funds from Top Gun unitholders that were placed into escrow on the belief that their funds would be used in a manner consistent with the Member Agreements so that **BRITTON-HARR** could divert those funds for unauthorized and undisclosed purposes, including his own personal benefit.

### Manner and Means

14.      To further this scheme, and to accomplish its purposes, **BRITTON-HARR** used the followings methods, manners, and means:

15.     It was part of the scheme to defraud that **BRITTON-HARR** used email, text messages, and telephone calls to promote **AeroVanti** and to communicate with members, potential members, investors, lenders, and others.

16.     It was further part of the scheme to defraud that **BRITTON-HARR** caused Individual-1 and a second individual, known as Individual-2, to recruit members into **AeroVanti**'s Top Gun program

4

through material misrepresentations and omissions of material facts. Specifically, **BRITTON-HARR** misled Individual-1 and Individual-2 into falsely believing that Top Gun members' money would be used to purchase specific aircraft, and that the LLCs, into which they and their money would be organized, would temporarily hold title to the aircraft as security for their pre-payment of flight hours. **BRITTON-HARR** then caused Individual-1 and Individual-2 to recruit potential Top Gun members based on this false belief.

17.     For example, on or about February 24, 2022, **BRITTON-HARR** sent an email to Individual-1 and Individual-2 regarding the establishment of the new Top Gun member program:

> Good morning, I agree an escrow arrangement where funds are fully collected and held for each aircraft acquisition group is best. Funds can be released at time of closing and lien being filed … In the meantime, please [l]et me know your initial thoughts on this structure below …
>
> 1) Establish LLC (~20 Member Units) & Draft Owner addendum to LLC Member Agreement
> 2) Each Member Unit = 100hrs @ $1500hr ($150,000 Block purchase *~20 = $3MM)
> 3) Set up and fund Escrow
> 4) AeroVanti identify aircraft & purchase aircraft
> 5) Place LLC Lien on aircraft at closing
> 6) Issue Stock Warrant at Closing to LLC
> 7) Start Flying

18.     At times, **BRITTON-HARR** made material misrepresentations to Top Gun members by claiming he was executing a "rolling close" to purchase and obtain title to aircraft. For example, on or about March 30, 2022, **BRITTON-HARR** sent an email to Individual-1 and Individual-2 in which **BRITTON-HARR** falsely stated:

> I spoke with the seller and with the current list of participating members for 44Z, the amount ($825k) of deposits will allow for the title to be released and we can close. We can then allow for a rolling close for the additional participating members to join but this way we have secured the aircraft.

19.     It was further part of the scheme to defraud that **BRITTON-HARR** caused Individual-1 to form LLCs in Maryland.  These LLCs were intended to organize the Top Gun members, obtain their initial "unitholder" deposits of $150,000, and to temporarily hold title to the aircraft they were created to purchase.

20.     It was further part of the scheme to defraud that **BRITTON-HARR** caused the escrow agent to prepare disbursal instructions to authorize the release of Top Gun unitholder funds to **AeroVanti**.

21.     It was further part of the scheme to defraud that **BRITTON-HARR** caused Individual-1 to authorize the disbursal of Top Gun unitholder funds from the escrow account by falsely representing, and by misleading Individual-1 into falsely believing, that the money would be used to purchase, refurbish, and obtain title to specific aircraft, and by concealing his intent to divert the funds for unauthorized and undisclosed purposes.  Among other things, **BRITTON-HARR** falsely certified that disbursals of unitholder funds were consistent with the Member Agreement and, when communicating with Individual-1 and other Top Gun unitholders, **BRITTON-HARR** omitted his intent to use unitholder funds for undisclosed and unauthorized purposes.

22.     **BRITTON-HARR** caused disbursals from the escrow account by falsely representing to Individual-1 that the money would be used to purchase, refurbish, and acquire title to the aircraft described in the disbursal instructions.  In truth and in fact, **BRITTON-HARR** did not use any of the money he caused to be disbursed to purchase the relevant aircraft, nor did **BRITTON-HARR** cause title to those aircraft to be held in escrow as the Member Agreement required.  Instead, **BRITTON-HARR** misappropriated the Top Gun unitholder funds for undisclosed and unauthorized purposes, including his own personal use.

23.     It was further part of the scheme to defraud that between approximately April 2022 and October 2022, **BRITTON-HARR** caused approximately twenty eight disbursals of escrowed Top Gun

unitholder funds—totaling approximately $14,750,000—to bank accounts belonging to **AeroVanti** that **BRITTON-HARR** controlled. Among these were checking accounts at Bank-1 ending in x4642 ( "the x4642 account") and x0104 ( "the x0104" account").

24.     It was further part of the scheme to defraud that **BRITTON-HARR** concealed and attempted to conceal the scheme by limiting access to **AeroVanti's** checking accounts.

25.     It was further part of the scheme to defraud that **BRITTON-HARR** fraudulently transferred Top Gun unitholder funds from bank accounts belonging to **AeroVanti** to his personal bank accounts and those of his wife, T.D. Among his personal bank accounts was a checking account at Bank-2 ending in x5923 ("the x5923 account"). Among T.D.'s personal bank accounts was a checking account at Bank-3 ending in x1153 ("the x1153 account").

26.     It was further part of the scheme to defraud that **BRITTON-HARR** obtained and used Top Gun member funds for unauthorized and undisclosed purposes, including his own personal use. These uses included, but were not limited to, paying for living expenses, purchasing boats, purchasing jewelry, and paying rent. For example:

a.  On or about April 21, 2022, **BRITTON-HARR** misappropriated Top Gun unitholder funds by wiring $100,000 from the x4642 account to the x1153 account.

b.  On or about May 27, 2022, **BRITTON-HARR** misappropriated Top Gun unitholders funds by wiring $100,000 from the x4642 account to the x5923 account. **BRITTON-HARR** spent approximately $65,000 of this money at a jewelry store in Pensacola, Florida.

c.  Between approximately June and August of 2022, **BRITTON-HARR** misappropriated approximately $125,000 of Top Gun unitholder funds to purchase a boat known as "the Permit." **BRITTON-HARR** accomplished this by wiring Top Gun unitholder funds from the x4642 account and the x0104 account to the x5923 account.

d.   In and around August and September 2022, **BRITTON-HARR** misappropriated approximately $80,000 of Top Gun unitholder funds to purchase a boat. **BRITTON-HARR** accomplished this by wiring Top Gun unitholder funds from the x4642 account to the x5923 account and issuing a check for $80,000 from the x5923 account.

e.   In and around September 2022, **BRITTON-HARR** misappropriated approximately $306,000 of Top Gun unitholder funds to purchase a yacht known as "the Triple Lindy." **BRITTON-HARR** accomplished this by wiring approximately $1,000,000 of Top Gun unitholder funds from the x4642 account to the x0104 account and using a portion of those funds to purchase the Triple Lindy.

f.   In and around October 11, 2022, **BRITTON-HARR** misappropriated approximately $30,000 of Top Gun unitholder funds to pay rent for a property in and around Tampa, Florida.

27.   It was further part of the scheme to defraud that in and around November 2022, **BRITTON-HARR** invited Top Gun unitholders to visit Sarasota, Florida after he learned that an email concerning **BRITTON-HARR'S** misappropriation of unitholder funds and mismanagement of **AeroVanti** was sent to Top Gun unitholders.

28.   It was further part of the scheme to defraud that **BRITTON-HARR** attempted to conceal his scheme by borrowing additional funds to purchase aircraft that he already falsely claimed to have purchased with Top Gun unitholder funds. Specifically, in and around April 2023, **BRITTON-HARR** fraudulently obtained a loan of approximately $1,500,000 from a group of **AeroVanti** investors ("Lender Group-1"). **BRITTON-HARR** represented that he would use this loan to purchase the aircraft known as N290BC. **BRITTON-HARR** misled Lender Group-1 into providing this loan by, among other means,

8

concealing and omitting the existence of 90BC, LLC and the fact that **AeroVanti** had been sued by N290BC's owner for re-possession of the aircraft's logbooks and records.

**Execution Of The Scheme To Defraud**

29.     On or about the dates specified below as to each count, in the District of Maryland, and elsewhere,

**PATRICK TORMAY BRITTON-HARR,**

the defendant herein, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate commerce by means of a wire communication, certain signals, signs and sounds, as set forth below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF INTERSTATE WIRE |
|---|---|---|
| 1 | April 5, 2022 | Transmission of Disbursal Instruction for approximately $675,000 from 44Z, LLC from Oklahoma to Individual-1 in Maryland |
| 2 | May 27, 2022 | Transmission of Disbursal Instruction for approximately $1,650,000 from 90BC, LLC from Oklahoma to **BRITTON-HARR** in Maryland |
| 3 | June 23, 2022 | Transmission of Disbursal Instruction for approximately $825,000 for N189LW, LLC from Oklahoma to **BRITTON-HARR** in Maryland |
| 4 | August 26, 2022 | Transmission of Disbursal Instruction for approximately $1,275,000 for N111VR, LLC from Oklahoma to **BRITTON-HARR** in Maryland |
| 5 | September 15, 2022 | Transmission of Disbursal Instruction for approximately $450,000 from N111VR, LLC from Oklahoma to Individual-1 in Maryland |
| 6 | September 15, 2022 | Transmission of Disbursal Instruction for approximately $950,000 from N1037W, LLC from Oklahoma to Individual-1 in Maryland |

18 U.S.C. § 1343

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.     Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under the offenses in Counts One through Six of this Indictment.

### Wire Fraud Forfeiture

2.     Upon conviction of the offenses in Counts One through Six of this Indictment, the defendant,

### PATRICK TORMAY BRITTON-HARR,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

3.     The property to be forfeited includes, but is not limited to, a money judgment in the amount of at least $16,250,000.

### Substitute Assets

4.     If any of the property described above, as a result of any act or omission of the defendant:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

Kelly O. Hayes
United States Attorney

LORINDA I. LARYEA
CHIEF, FRAUD SECTION

DAVID A. PETERS
Trial Attorney, Fraud Section
Department of Justice
1400 New York Ave., N.W.
Washington, DC 20005
Phone: (202) 616-5420
Email: David.Peters2@usdoj.gov

A TRUE BILL:

SIGNATURE REDACTED
Foreperson

5/8/2025
Date

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: 1:25-cr-00143-ABA |
| vs. | |
| **PATRICK TORMAY BRITTON-HARR** | **PENALTIES** |
| Defendants. | |

## PENALTIES FOR COUNTS ONE THROUGH SIX
### (WIRE FRAUD)

| | |
|---|---|
| Class C Felony | 18 U.S.C. § 3559(a)(3) |
| Imprisonment for not more than 20 years | 18 U.S.C. § 1343 |
| Fine of $250,000.00 | 18 U.S.C. § 3571(b)(3) |
| Supervised release not more than 3 years | 18 U.S.C. § 3583(b)(2) |
| Special Assessment of $100.00 | 18 U.S.C. § 3013(a)(2)(A) |



*hmg 5.7.25*

ADE/MPP: USAO # 2024R00025

MAY 0 8 2025

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. ABA-25-144 |
| v. | (Health Care Fraud, 18 U.S.C. § 1347; Transactional Money Laundering, 18 U.S.C. § 1957; Aiding and Abetting, 18 U.S.C. § 2; Forfeiture, 18 U.S.C. § 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c)) |
| PATRICK TORMAY BRITTON-HARR, | |
| Defendant. | |
| | **UNDER SEAL** |

### INDICTMENT

The Grand Jury for the District of Maryland charges that:

### COUNTS ONE THROUGH FIVE
**Health Care Fraud**

At all times material to this Indictment:

#### The Defendant and Relevant Entities

1.      Defendant **PATRICK TORMAY BRITTON-HARR ("BRITTON-HARR")** was a resident of Maryland and Florida.

2.      Among other entities, **BRITTON-HARR** owned and controlled Provista Health, LLC ("Provista"), Coastal Laboratories, Inc. ("Coastal Labs"), Coastal Management Group, Inc. ("Coastal Management"), and AMS Onsite, Inc. ("AMS Onsite"), all of which were based in Annapolis, Maryland.

3.      Provista was a Maryland limited liability company that provided clinical laboratory testing to nursing homes and other facilities.   Provista performed clinical laboratory testing at laboratories it operated in Arizona for a short period of time in 2020, and referred laboratory tests to other clinical laboratories.

4.      Coastal Labs was a Delaware corporation that owned Provista.

5.      Coastal Management was a Delaware corporation that provided marketing services for Coastal Labs.

6.      AMS Onsite was a Delaware corporation that provided infection control and prevention services to nursing homes and other facilities, including by soliciting quarterly respiratory tests for residents of nursing homes and other facilities.

7.      **BRITTON-HARR** opened, controlled, and was a signatory on various bank accounts held in the names of the entities identified above, including accounts at Truist Bank (formerly BB&T Bank) ending in x8122 in in the name of Provista, ending in x5116 in the name of Coastal Labs, ending in x2988 in the name of AMS Onsite, and ending in x3258 in the name of Coastal Management.

**Medicare Program**

8.      The Medicare Program ("Medicare") was a federally funded health care program that provided benefits to individuals who were 65 years old and older, and to certain disabled persons.   The benefits available under Medicare were governed by federal statutes and regulations.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services ("HHS").

9.      Medicare was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

10.     Medicare was divided into four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B covered medically necessary physician office services and outpatient care,

including laboratory tests.

11.     Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."   Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique number.

12.     Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided items and services to Medicare beneficiaries were able to apply for and obtain a "provider number."   Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

13.     When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (i) the beneficiary's name and Health Insurance Claim Number ("HICN"); (ii) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (iii) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").   Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

14.     Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B.   The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.   The MACs were responsible for processing

3

Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

15.    To receive Medicare reimbursement, providers, including laboratories, were required to apply to the appropriate MAC and execute a written provider agreement in which an authorized representative of the provider agreed, among other things, to comply with all Medicare-related laws and regulations and not to submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.

16.    Payments under Medicare Part B were often made directly to the provider rather than to the beneficiary.   Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented.

17.    In certain limited circumstances, Medicare permitted laboratories to establish arrangements with so-called "reference laboratories."   Such arrangements existed when a laboratory received a specimen for testing, but instead of testing the specimen in-house, the laboratory acted as a "referring laboratory" by sending the specimen to another laboratory, the "reference laboratory," to complete the testing.   When submitting claims for reimbursement for specimens tested by a reference laboratory, Medicare required the referring laboratory to identify the reference laboratory that performed the test.

### Laboratory Testing

18.    Clinical laboratories performed various tests, including tests for COVID-19 and respiratory pathogens.   These tests were often performed on specimens collected from nasal

swabs.   Physicians, nurse practitioners, and other authorized providers could issue orders for laboratory testing for Medicare beneficiaries and other patients.

19.    Laboratories could perform tests to detect whether an individual had COVID-19. Laboratories could also perform tests to detect a variety of viral and bacterial respiratory pathogens.   Tests for respiratory pathogens were sometimes performed in "panels" that targeted multiple pathogens, known as a respiratory pathogen panel ("RPP").   Panels could be designed to test different numbers of pathogens.

20.    Claims for reimbursement of laboratory tests were submitted to Medicare using CPT codes, a set of standardized codes used by medical professionals, laboratories, and other medical providers to describe the services they provided.   There were CPT codes for RPP tests that targeted multiple pathogens, as well as codes for individual pathogen tests that could be included in a panel.

21.    In general, the amounts Medicare reimbursed laboratories for RPP tests and other respiratory pathogen tests were several times higher than the amounts they reimbursed for COVID-19 testing.

### The Scheme to Defraud

22.     From in or around February 2020, and continuing through in or around August 2021, in the District of Maryland and elsewhere, the defendant, **PATRICK TORMAY BRITTON-HARR**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute and attempt to execute a scheme to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain and attempt to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, in violation of Title 18, United States Code, Sections 1347 and 2 (hereinafter the "scheme to defraud").

### Purpose of the Scheme to Defraud

23.     It was a purpose of the scheme to defraud for the defendant, **BRITTON-HARR**, to unlawfully enrich himself and others by: (a) submitting and causing the submission of false and fraudulent claims to Medicare for RPP tests during the COVID-19 pandemic that were medically unnecessary, not provided as represented, not performed, and ineligible for reimbursement; (b) concealing the submission of false and fraudulent claims; and (c) obtaining proceeds of the fraud for the personal use and benefit of the defendant and others, and to further the fraud.

### Manner and Means of the Scheme to Defraud

24.     The manner and means by which the defendant, **BRITTON-HARR**, and others known and unknown to the Grand Jury sought to accomplish the objects and purpose of the scheme to defraud included, among other things:

   a.  **BRITTON-HARR** controlled, operated, and directed Provista, Coastal Labs, Coastal Management, and AMS Onsite.

   b.  **BRITTON-HARR** submitted and caused the submission of enrollment documents to Medicare for Provista, in which he attested he would not knowingly present or cause to be presented false and fraudulent claims for payment by Medicare and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

   c.  After the COVID-19 pandemic began, **BRITTON-HARR**, through the entities he controlled, obtained specimens from Medicare beneficiaries and others for the purpose of performing COVID-19 testing (the "COVID-19 Specimens"). The COVID-19 Specimens were collected from residents at nursing homes and other facilities in Maryland and elsewhere to conduct screening tests to identify and isolate individuals infected with COVID-19. At **BRITTON-HARR**'s direction, the COVID-19 Specimens were sent to a reference laboratory, which conducted the COVID-19 tests.

   d.  At **BRITTON-HARR**'s direction, after the COVID-19 Specimens were tested for COVID-19 by a reference laboratory, the COVID-19 Specimens were generally sent either to Provista's laboratories in Arizona or to reference laboratories, where **BRITTON-HARR** caused single-panel RPP tests to be performed on the COVID-19 Specimens that had been collected for the purpose of performing COVID-19 screening tests.

   e.  **BRITTON-HARR** caused the RPP tests to be performed even though the physicians and medical professionals treating the residents of the nursing homes and other facilities ordered only COVID-19 tests and did not order RPP tests, and even though it was not medically necessary to conduct RPP tests on asymptomatic individuals who were being screened to identify

COVID-19 infections.

        f.      **BRITTON-HARR** caused Provista to submit false and fraudulent claims to Medicare for RPP tests performed on the COVID-19 Specimens, in that the claims were submitted for tests that were not ordered as represented, medically unnecessary, and ineligible for reimbursement.

        g.      **BRITTON-HARR** further caused Provista to submit false and fraudulent claims to Medicare for RPP tests that were never performed, including by causing the submission of claims to Medicare for tests that were purportedly performed on specimens collected from beneficiaries after they had died.

        h.      When submitting the false and fraudulent claims to Medicare for the RPP tests, **BRITTON-HARR** caused Provista to submit claims using false and fraudulent CPT codes, which, among other things, concealed that the RPP tests were performed in a single panel and made it falsely appear as though certain tests were performed individually, in order to receive and maximize reimbursement for services that Medicare would not have otherwise paid for.

        i.      When submitting claims to Medicare, **BRITTON-HARR** caused Provista to conceal that certain tests were not performed by Provista but were instead purportedly performed by reference laboratories.

        j.      **BRITTON-HARR** caused Medicare reimbursements to be deposited into Provista's bank account, from which **BRITTON-HARR** caused transfers to be made to other bank accounts he controlled to fund purchases of real estate, cars, and other luxury items.

        k.      In total, **BRITTON-HARR** caused Provista to submit more than $15 million of false and fraudulent claims to Medicare for RPP tests that were not ordered as

represented, medically unnecessary, not performed, and ineligible for reimbursement.    As a result

of these false and fraudulent claims, Medicare paid Provista more than $5 million.

### The Charges

25.    On or about the dates set forth below, in the District of Maryland and elsewhere,

the defendant,

### PATRICK TORMAY BRITTON-HARR,

for the purpose of executing and attempting to execute the scheme to defraud as described above,

submitted and caused to be submitted the following false and fraudulent claims to Medicare that

that were medically unnecessary, not provided as represented, not performed, and ineligible for

reimbursement, each constituting a separate count:

| Count | Medicare Beneficiary | Approx. Date of Service | Approx. Date Claim Submitted | Procedure Codes | Approx. Amount Billed to Medicare |
|-------|----------------------|-------------------------|------------------------------|-----------------|-----------------------------------|
| 1 | H.F. | 7/28/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |
| 2 | E.L. | 8/17/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |
| 3 | W.A. | 8/19/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |
| 4 | E.K. | 8/19/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |

| 5 | V.B. | 8/19/20 | 9/11/20 | 87486, 87496, 87498, 87502, 87532, 87541, 87581, 87640, 87798 | $796.90 |

18 U.S.C. § 1347
18 U.S.C. § 2

## COUNT SIX
### Conducting Transaction in Criminally Derived Proceeds

1.     The allegations in paragraphs 1 through 7 are realleged and incorporated herein by reference.

2.     On or about December 30, 2020, in the District of Maryland and elsewhere, the defendant,

### PATRICK TORMAY BRITTON-HARR,

did knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that he caused a wire transfer of approximately $112,500 from the Truist account ending in x3258 in the name of Coastal Management to Car Dealership 1 to purchase a Porsche 911 vehicle, such property having been derived from a specified unlawful activity, that is, health care fraud, in violation of Title 18, United States Code, Section 1347.

18 U.S.C. § 1957(a)
18 U.S.C. § 2

11

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on any of the offenses charged in this Indictment.

### Health Care Fraud Forfeiture

2.      Pursuant to 18 U.S.C. § 982(a)(7), upon a conviction of any of the offenses set forth in Counts One through Five of this Indictment, the defendant, **PATRICK TORMAY BRITTON-HARR**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

### Money Laundering Forfeiture

3.      Pursuant to 18 U.S.C. § 982(a)(1), upon a conviction of the offense set forth in Count Six of this Indictment, the defendant, **PATRICK TORMAY BRITTON-HARR**, shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property.

### Substitute Assets

4.      If any of the property described above, as a result of any act or omission of the defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

12

d.  has been substantially diminished in value; or

e.  has been commingled with other property that cannot be subdivided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

KELLY O. HAYES
United States Attorney
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201


LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice


CHRISTOPHER A. WENGER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 445-9670

A TRUE BILL:

**SIGNATURE REDACTED**
Foreperson

5/3/2025
Date

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

vs.

**PATRICK TORMAY BRITTON-HARR**

Defendants.

Criminal No.: 1:25-cr-00144-ABA

**PENALTIES**

## PENALTIES FOR COUNTS ONE THROUGH FIVE
### (HEALTH CARE FRAUD)

Up to 10 years imprisonment

Fine of $250,000 or twice the gross gain/loss of the offense

Up to three years of supervised release

$100 Special Assessment

## PENALTIES FOR COUNT SIX
### (CONDUCTING TRANSACTIONS IN CRIMINALLY DERIVED PROCEEDS)

Up to 10 years imprisonment

Fine of $250,000 or twice the amount of the criminally derived property derived from the specified unlawful activity

Up to three years of supervised release

$100 Special Assessment